Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Wednesday, July 29, 2009 3:56:17 PM

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE: ) | |
| ) | |
| WILLIAM B. POE, and ) | Case No. 08-906 |
| KATHLEEN POE ) | |
| ) | |
| Debtors. ) | Chapter 12 |

## MEMORANDUM OPINION

In their proposed Chapter 12 plan, William and Kathleen Poe (the "Debtors") seek to strip down the deed of trust liens of the Farm Service Agency ("FSA") to the value of their real property and then amortize the notes secured by the deeds of trust over a 40 year period. The FSA objects to the Debtors' proposed treatment of their loans, contending that: (1) the Debtors are not family farmers under the Bankruptcy Code, and (2) the Debtors cannot use the Bankruptcy Code to rewrite the lending criteria of the FSA.

Before addressing the latter contention, the court held an evidentiary hearing to determine the Debtors' eligibility to file a Chapter 12 bankruptcy petition. For the reasons stated herein, this court concludes that the Debtors fail to meet the "farm income test" of 11 U.S.C. § 101(18). As such, the Debtors are not "family farmers" and, thus, are ineligible to file a Chapter 12 bankruptcy petition.

## I. BACKGROUND

The Debtors' property consists of 50 acres of land located in Lost Creek, West Virginia. The improvements on the property consist of the Debtors' residence, three barns, and an indoor arena. Since 1969, the Debtors have been in the business of breeding, raising, training, and selling horses. In recent years, the boarding of horses has become a large part of the Debtors' business. Currently, the Debtors train and board 7 horses, and they care for 8 horses of their own.

In addition, the Debtors used to raise and sell beef cattle. By 1986, the Debtors accumulated between 125-150 head. That same year, however, drought limited quality grazing

1

land and water. To maintain the herd, Debtors rented pasture and purchased additional feed. The Debtors were also forced to sell several head to repair farm equipment, among other things.

By the mid-90s, the Debtors became unable to make their loan payments to the FSA. Upon the recommendation of the FSA, the Debtors sold all remaining cattle and related farm equipment in 1996-97 to satisfy a portion of their FSA loans. In 1998, Mr. Poe began working full time for the Harrison County Board of Education.

In 2009, after the Debtors filed their bankruptcy petition, they began a new cattle grazing operation whereby they are feeding 15 head of cattle owned by a third party. The Debtors will receive a fee based on the weight gained from grazing over the course of the spring and summer, and the Debtors expect to earn about 28 cents for each pound that the herd gains over this period. According to his testimony, Mr. Poe expects each animal to gain approximately 200 pounds.

## II. DISCUSSION

The FSA argues that the Debtors are not eligible to file a Chapter 12 petition. The gravamen of the FSA's argument is that the boarding and training of horses, which constitutes the bulk of the Debtors' claimed farm income, does not constitute a "farming operation."

Section 109(f) of the Bankruptcy Code states, "Only a family farmer . . . with regular annual income may be a debtor under Chapter 12 of this title." 11 U.S.C. § 109(f). The Bankruptcy Code then provides extensive definitions as to who is a "family farmer," who is a "family farmer with regular annual income," and what constitutes a "farming operation":

> (18) The term "family farmer" means—
> (A) individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $ 3,544,525 and not less than 50 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for—
> > (i) the taxable year preceding; or
> > (ii) each of the 2d and 3d taxable years preceding the taxable year in which the case concerning such individual or such individual and spouse was filed; . . .

2

> (19) The term "family farmer with regular annual income" means family farmer whose annual income is sufficiently stable and regular to enable such family farmer to make payments under a plan under chapter 12 of this title.
>
> (21) The term "farming operation" includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state.

11 U.S.C. § 101(18), (19), (21).

Accordingly, to be a "family farmer" eligible to file a Chapter 12 petition, the Debtors in this case must be: (1) individuals; (2) with aggregate debts of $3,544,525 or less; (3) engaged in a "farming operation;" (4) have at least 50% of their aggregate, noncontingent liquidated debts arising out of a farming operation, owned by them; (5) receive more than 50% of their gross income from such operation; and (6) have annual income sufficiently stable and regular to make payments under a Chapter 12 plan.

Here, for purposes of determining eligibility, the parties do not dispute elements (1), (2), or (6). Namely, the Debtors are individuals with aggregate debts of less than $3,544,525, and, according to the Debtors' schedules of income and expenses, they have monthly disposable income of $777, which is more than sufficient to make their proposed $636 monthly Chapter 12 plan payment.

With regard to elements (3), (4), and (5), however, the parties dispute whether the Debtors are currently engaged in a "farming operation," and, therefore, are in dispute as to the percentage of income and debts related to the purported "farming operation."

**A. "Farming Operation"**

In the FSA's view, the boarding and training of horses is not sufficiently akin to the types of "farming operations" listed in § 101(21), and, therefore, income related to the Debtors' boarding and training operations should not be considered in determining whether the Debtors qualify as "family farmers."

To qualify as a "family farmer" under the Bankruptcy Code, the Debtors' operations must be examined "on the date the case is filed." § 101(18)(A). The Debtors in this case filed their voluntary petition for Chapter 12 relief on June 11, 2008. At that time, the Debtors' only activities on their land related to the raising, training, and boarding of horses. Accordingly, the court must examine which, if any, of these activities constitute "farming operations."

3

As defined above, a "farming operation" includes "farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." § 101(21). This list is not exclusive. *E.g., Rinehart v. Sharp (In re Sharp)*, 361 B.R. 559, 564 (B.A.P. 10th Cir. 2007) ("The definition of 'farming operation' does not provide an exclusive list of all farming activities and is not limited to the specific activities delineated in the statute."). The definition of a "farming operation" is to be "construed liberally in order to further Congress' purpose of helping family farmers to continue farming." *In re Watford*, 898 F.2d 1525, 1527 (11th Cir. 1990); *see also* 124 Cong. Rec. H 11090 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards) ("This definition gives a broad construction to the term 'farming operation.'"); 124 Cong. Rec. S 17406-7 (daily ed. Oct. 6, 1978) (remarks of Sen. Deconcini) (same).

Existing case law discussing whether the boarding or training of horses constitutes a "farming operation" is mixed. As discussed below, at least two cases have determined that this type of operation is not a farming operation, and at least two cases have concluded that such activities do constitute a farming operation.

In the case of *In re McKillips*, 72 B.R. 565 (Bankr. N.D. Ill. 1987), the debtors bred, trained, and showed horses. Their 14 acres of land contained their residence, two buildings used for stables and training, and a 10-acre alfalfa field. The debtors also rented 27 acres of additional pasture. For a fee, the debtors took in horses from third parties, bred them, and then raised, trained, showed, and/or sold them. Although the debtors also raised horses for livestock, this activity was incidental to their main occupation of training and showing horses. The court concluded that the debtor's operation was essentially a service occupation—not one that produced agricultural goods for consumption. Because the measure of the debtor's compensation was a fee rather than a share of the profits at some future sale, the debtor's profits were not at the mercy of the weather or the farm economy. These might affect their profits, but any effect was indirect, *i.e.*, risks attendant with a farming operation were not present. Only the debtor's breeding of horses for sale, raising of horses for sale, and the actual sales of horses would constitute farming operations as only these would constitute the production of an agricultural product.

In the case of *In re Cluck*, 101 B.R. 691 (Bankr. E.D. Okla. 1989), the debtors sought to reorganize a horse breeding, training, and boarding operation. Utilizing a "risk-laden" approach,

4

the court first asked whether the debtor's operation was a "typical" farming activity. The court then analyzed whether the operation was subject to the inherent risks of farming, such as being subject to drought or other temporary, uncontrollable circumstances of farming. On the first point, the court determined that the training and boarding of horses was a service-oriented business. Second, the court found that the operation was "only minutely affected by the typically devastating effect of weather and other uncontrollable conditions."

In the case of *In re Showtime Farms, Inc.*, 267 B.R. 541 (Bankr. E.D. Tex. 2000), the debtor raised horses for resale, boarded, trained, and rented horses, and gave riding lessons to the general public. The debtor maintained a pasture for the horses and raised Bermuda grass on a portion of the property, although the debtor purchased most of the hay and feed for the animals. The debtor's property was insured under a farm policy and the property had a state tax agricultural exemption. The debtor's property contained traditional farm buildings. The court reasoned that, "[t]he debtor's operations [were] subject to the inherent risk of any farming operation including fluxuating [sic] market prices, feed prices, uncertain weather and risk to livestock from disease and injury." Thus, the court overruled an objection that the debtor was not eligible for Chapter 12 relief because debtor's operation was not a traditional farm.

In the case of *In re Buchanan*, No. 05-114, 2006 U.S. Dist. LEXIS 50968 (M.D. Tenn. July 25, 2006), the debtors bred, boarded, trained, and sold walking horses on 3.8 acres of land. The income the debtors received from the "boarding/training" portion of their horse business constituted 80% of the debtors' gross income for the years immediately preceding the filing of the bankruptcy petition. The debtors described themselves as "Horse Trainers." They boarded 22 horses that belonged to others and owned 11 horses including breeding stallions and brood mares. Although the debtors did not own a tractor or a plow, they did own a truck, a manure spreader, a horse cart, a horse trailer, and tack and supplies for maintaining the horses. The business was regulated by the Department of Agriculture. The court found that the debtors' business involved traditional farming risks, such as weather, supply and demand, health and upkeep of the animals, and the price of feed. Additionally, the court noted that "[i]n the case of livestock, farming . . . contemplates the breeding, maintaining and bringing to maturity of the animals and the subsequent marketing of the animals." *Id*. at 11. Thus, the court concluded "that . . . the debtors' breeding, raising and the actual sale of horses" constitute farming operations under 11 U.S.C. § 101(21).

5

Accordingly, despite the similar nature of the operations, the courts in the above four cases reached opposite conclusions. The courts in *McKillips* and *Cluck* focused on the following factors: (1) the debtors' operations were primarily service-oriented as opposed to being self-contained farming operations which produce agricultural goods for consumption; and (2) where the measure of a debtor's compensation is a fee rather than a share of the profits from some future sale, the debtor's profits are not at the mercy of the weather, the farm economy, or other uncontrollable circumstances of farming—any such effect being minute and indirect.

In contrast, the courts in *Showtime Farms* and *Buchanan* reasoned that the boarding and training of horses did involve traditional farming risks. Namely, the boarding and training of horses was subject to: (1) fluctuating market prices, (2) feed prices, (3) uncertain weather, (4) risk to livestock from disease and injury, and (5) upkeep of the animals. Neither court, however, explained exactly how these risk factors affected a horse boarding and training operation and/or how these risk factors compared with those faced by traditional farmers.

In analyzing the purpose of Chapter 12 to determine if certain debtors are eligible to file a petition under that Chapter, courts have formulated at least two tests to ascertain what constitutes a "farming operation." The first test focuses on two key factors: (a) the debtor's operations must be subject to cyclical risks such that drought or disease may result in the debtor's inability to pay creditors; and (b) the activity engaged in by the debtor must relate to the debtor's own farming operation and not the farming operations of others. *In re McNeal*, 848 F.2d 170, 171-72 (11th Cir. 1988); *see also In re Armstrong*, 812 F.2d 1024, 1027 (7th Cir. 1987) ("[F]armers are caught in a risk ridden enterprise.").

The second test is based on the "totality of the circumstances." Courts using this test should analyze the totality of the circumstances involved in the debtor's operation keeping in mind the remedial purposes behind Chapter 12. *E.g.*, *In re Sugar Pine Ranch*, 100 B.R. 28, (Bankr. D. Or. 1989) (holding that Chapter 12 eligibility determinations are to be based on the totality of the circumstances). Under a "totality of the circumstances" approach, however, a determination of whether a particular practice or operation is subject to the inherent risks of farming is "perhaps the key factor." *E.g.*, *Sugar Pine Ranch* 100 B.R. at 31. This factor is afforded the most weight because it represents Congress's recognition of the risks of farming, which drove the legislation creating Chapter 12 of the Bankruptcy Code. *See* 132 Cong. Rec. H 9000 (daily ed. October 2, 1986) (remarks of Rep. Edwards) ("Chapter 12 recognizes some of

the problems that are unique to family farmers."); 132 Cong. Rec. H 9002 (remarks of Rep. Hyde) ("Special family farmer provisions of the Bankruptcy Code are necessary to address unique problems facing the agricultural sector of our economy."). Under either test, however, in the court's view, the Debtors' horse boarding and training activities do not constitute a "farming operations" as defined by § 101(21).

Although the definition of a "farming operation" does not provide an exclusive list of all qualifying farming activities, and the definition is to be given a liberal construction to further Congress's purpose of helping family farmers, the delineation of what constitutes a "farming operation" is limited by the "*noscitur a sociis*" doctrine of statutory construction. 73 Am. Jur. 2d *Statutes* § 134 (2008). Under this doctrine, the meaning of a particular term in a statute may be ascertained by reference to words associated with it. For example, Congress specifically included tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, as constituting a "farming operation." Therefore, under the doctrine of *noscitur a sociis*, non-enumerated farming operations must be sufficiently akin to the types that are listed. One commonality shared by the enumerated examples is that each activity is a risk-laden enterprise whereby bad weather or disease can have a devastating effect on the farmer's business.

Here, the Debtors' boarding/training operations are at the risk of injury or disease as well as the risk that market prices for feed will rise. These are the same risks inherent in the raising of horses for livestock. Although the same risks are involved in both activities, raising horses for livestock is a "farming operation" whereas boarding and training horses is not. The distinction is that, in raising horses for livestock, the "family farmer" bears all risks. If an animal is lost to disease or serious injury, the family farmer receives no profit on the animal, has lost all that he has invested in it, and bears the cost of replacing it. In contrast, a boarding/training business is only minimally affected. While profits may falter in the short-term until a new boarder is located, no meaningful expense incurs to replace the animal. Additionally, the business owner would have recouped any monies invested for care and maintenance and would have profited for any investment of labor in the animal through the fees received from the horse owner up to the time in which the animal was lost. Similarly, if the market price for feed was to drastically increase, the boarding/training operator could simply pass this cost on to the owner, whereas the

family farmer must himself bear this risk which would result in less profit in the future sale of the animal.

For these reasons, the court concludes that the raising of horses by the Debtors constitutes a "farming operation," but the Debtors' boarding/training services do not.

### B. Percentage of Gross Income from Debtors' "Farming Operation"

Having concluded that the boarding and training of horses is not a "farming operation," the court must determine if the income received by the Debtors from the raising and selling of horses, which does constitute a farming operation, is sufficient to qualify the Debtors as "family farmers" as defined by § 101(18).

To be a "family farmer," the Debtors must receive more than 50% of their gross income from a "farming operation." The Debtors' 2007 tax return shows the following gross incomes: (a) $18,585 in wages to Mr. Poe from employment with the Harrison County Board of Education, (b) $18,200 received in fees from the boarding of horses, and (c) $5,000 earned from the sale of horses. Thus, only about 12 percent of the Debtors' gross income for 2007 came from a "farming operation." Therefore, the Debtors do not receive enough income from their farming operation to qualify as family farmers.

### III. CONCLUSION

For the above-stated reasons, the court concludes that the Debtors are not eligible to file a petition under Chapter 12 of the Bankruptcy Code. The court will enter a separate order pursuant to Fed. R. Bankr. P. 9021 that gives the Debtors 20 days to convert this case to one under another chapter. If a motion to convert is not timely filed, the court will dismiss the case without further notice or hearing.